UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------X
ELIZABETH MACKINDER,

        Plaintiff,

                              00 Civ. 6098 (DAB)
      - against -                  OPINION

SCHAWK, INC.,

        Defendant.
----------------------------------X
DEBORAH A. BATTS, United States District Judge.

Before the Court are Plaintiff Elizabeth Mackinder's ("Mackinder") and Defendant Schawk, Inc.'s ("Schawk") Motions for Summary Judgment to dismiss claims and counterclaims arising from a merger of Plaintiff's company, Mackinder Group ("MGI") with Schawk, Inc. Plaintiff has also moved for sanctions pursuant to Federal Rule of Civil Procedure 11.

For the reasons that follow, Plaintiff's Motion for Summary Judgment is GRANTED in part and DENIED in part and Defendant's Motion for Summary Judgment is GRANTED in part and DENIED in part. Plaintiff's Motion for Rule 11 Sanctions is DENIED.


## I.  BACKGROUND

Plaintiff Elizabeth Mackinder, a resident of New York State, is a specialist in the area of photographic retouching. Based on this specialty, Plaintiff formed a corporation, Mackinder Group, in or around 1991, which provided services to cosmetic industry

clients, including Revlon.  (Pl.'s 56.1 Stmt. ¶ 1; Def.'s Resp.
to Pl.'s 56.1 Stmt. ¶ 1.)  Plaintiff was the President of MGI and
its sole shareholder.  (Am. Compl. ¶ 9.)  Defendant Schawk, Inc.
is a publicly-owned company which provides printing services
through its many divisions in the United States and Canada.
(Pl.'s 56.1 Stmt. ¶ 2; Def.'s Resp. to Pl.'s 56.1 Stmt. ¶ 2.)
Schawk is a corporation organized under the laws of Delaware,
with its principal place of business in Illinois, and which also
conducts business in New York State.  (Am. Compl. ¶ 4.)

On June 30, 1998, Schawk acquired Chromart ("Chromart"), a
color retouching facility that had worked with MGI since 1995.
(Id. ¶ 12.)  In the second half of 1998, MGI and Schawk began
discussions regarding the potential acquisition of MGI by Schawk.
(Pl.'s 56.1 Stmt. ¶ 4; Def.'s Resp. to Pl.'s 56.1 Stmt. ¶ 4.)
Plaintiff's lawyer, Ira Goldstein ("Goldstein"), participated in
the merger negotiations, making offers on Plaintiff's behalf.
(Def.'s 56.1 Stmt. ¶ 9; Pl.'s Resp. to Def.'s 56.1 Stmt. at 4.)
During the negotiations, Schawk reviewed MGI's financial records
and interviewed accountants outside the presence of Mackinder or
any representative of MGI.  (Pl.'s 56.1 Stmt. ¶ 6; Def.'s Resp.
to Pl.'s 56.1 Stmt. ¶ 6.)  After conducting due diligence and
further conversations with Plaintiff and Goldstein, Schawk's
president, David Schawk, personally made the decision to go ahead

with the acquisition.  (Pl.'s 56.1 Stmt. ¶ 10; Def.'s Resp. to
Pl.'s 56.1 Stmt. ¶ 10.)

On July 29, 1999, MGI became a division of Schawk pursuant
to a merger.  (Am. Compl. ¶ 8.)  $1,760,000.00 was given by
Schawk to Mackinder as consideration for the merger, which
consisted of $618,000.00 in cash, 81,703 shares of Schawk common
stock with a value of $792,000.00 on the date of closing, and
$350,000.00 which was maintained in an escrow account by Pryor
Cashman Sherman & Flynn LLP "in order to secure the payment to
Schawk of the indemnification obligations" of Mackinder.  (Def.'s
56.1 Stmt. ¶ 11; Pl.'s Resp. to Def.'s 56.1 Stmt. at 4.)

The Schawk common stock was unregistered and subject to the
following restrictions:

> The shares represented by the certificate have not
> been registered under the Securities Act of 1933,
> . . . and are subject to the conditions specified in
> a certain agreement and plan of reorganization dated
> July 29, 1999, by and among Schawk, Inc. and the
> other parties thereto.  The shares represented by
> this certificate may not be transferred in violation
> of such act and laws, the rules and regulations
> thereunder or the provisions of said stock purchase
> agreement . . .  The holder of this certificate, by the
> acceptance of this certificate, agrees to be bound
> by the provisions of such stock purchase agreement.

(Brickell Aff. at Ex. F.)  The $350,000.00 in the escrow account
was governed by an Escrow Agreement, which provided that
$250,000.00 of the $350,000.00 would be earmarked for a potential

3

price reduction contemplated by Section 2.2 of the Merger

Agreement and held in escrow from July 30, 1999 to July 30, 2000.

(Pl.'s 56.1 Stmt. ¶¶ 16-18; Def.'s Resp. to Pl.'s 56.1 Stmt. ¶¶

16-18.)

> The Merger Agreement contained the following provision:

> In the event that MGI fails to achieve sales . . .
> for any twelve month consecutive month . . . of
> Two Million Five Hundred Thousand Dollars
> ($2,500,000) or more, then the Merger Consideration
> shall be reduced . . . . Any such reduction in Merger
> Consideration shall be calculated on the basis of
> income statements for MGI, prepared by Schawk, on
> a basis consistent with the manner in which the
> Annual Financial Statements have been prepared
> (to the extent such manner is in accordance with
> [Generally Accepted Accounting Principles ("GAAP")])
> and in accordance with GAAP . . . Schawk agrees to
> maintain until at least December 31, 1999, books
> and records for MGI on a stand-alone basis so that
> such annual sales amount can be computed. On or
> prior to February 15, 2000, Schawk shall deliver to
> Stockholders an income statement for MGI division or
> subsidiary of Schawk for each of twelve-month
> periods commencing on or after October 1, 1998 and
> ending on or before December 31, 1999.

(Def.'s Answer and Counterclaims at Ex. A, § 2.2.) Schawk did

not provide any GAAP income statements for MGI or other financial

documents to MGI. (Pl.'s 56.1 Stmt. ¶ 15; Def.'s Resp. to Pl.'s

56.1 Stmt. ¶ 15.)

On or about August 1, 1999, Mackinder and Schawk entered

into an Employment Agreement ("Employment Agreement") which set

forth the terms of Mackinder's employment as President of MGI,

division of Schawk. (Am. Compl. ¶ 7.)

The Employment Agreement provided that Mackinder would serve
as President of MGI and provide services consistent with that
position. (Id. ¶ 13.) In addition, the Employment Agreement
specifically provided that Mackinder would report to Schawk's
President or Executive Vice President, that she would be given
administrative and sales assistance as commercially practicable,
and that she would control and direct MGI's quality control,
subject to Schawk's President and Executive Vice President. (Id.
¶¶ 14-15.)

The Employment Agreement set forth terms that tied
Mackinder's compensation to MGI's sales. Mackinder's annual
salary was to be a base amount of $330,000.00 a year. (Am.
Compl. at Ex A, ¶ 2.) Mackinder's compensation, however, was to
be reduced if MGI's annual sales fell below $1,800,00.00. As
Paragraph 2(b) of the Employment Agreement states in pertinent
part:

> The foregoing notwithstanding in the event that MGI's
> annual sales measured quarterly commencing December 31,
> 1999 on a trailing twelve month basis fall below
> $1,800,000 then in lieu of the base salary . . . and
> the bonus payable pursuant to paragraph 3 . . . ,
> Schawk shall pay you a commission equal to fifteen
> percent (15%) of MGI's collected sales (net of any
> chargebacks and allowances) minus an annualized amount
> equal to $20,000 . . . In the event that, on any
> succeeding quarterly measuring date, MGI's annual
> sales measured on a trailing twelve month basis exceed

5

> $1,800,000, then you shall be reinstated to the salary
> and bonus provided in paragraph 2(1) . . . and paragraph
> 3 below.

(Id.)

Schawk, through Steven King ("King"), General Manager of Chromart, provided certain administrative services to MGI, including the placement of an advertisement in the *New York Times* for an assistant to Mackinder. Serge Pepin ("Pepin") of Horan, another division of Schawk, was to provide accounting services to Mackinder. (Def.'s 56.1 Stmt. ¶¶ 13-15; Pl.'s Resp. to Def.'s 56.1 Stmt. at 5.) Chromart continued to provide color retouching services for MGI's Revlon contracts after the Merger. (Am. Compl. ¶ 12; Def.'s 56.1 Stmt. ¶ 17; Pl.'s Resp. to Def.'s 56.1 Stmt. at 6.)

Defendant and Plaintiff's accounts of what transpired during Plaintiff Mackinder's employment at Schawk differ vastly. Parties do, however, agree that in a letter, dated March 6, 2000, Ronald Vittorini, Corporate Counsel of Schawk, sent Goldstein a letter regarding a possible change in Plaintiff's compensation due to sales in an amount below $1,800,000.00. Vittorini attached a Preliminary Sales Summary to the letter, outlining MGI's sales from August 1997 to December 1999. (Brickel Aff. at Ex. E.) A few months later, on August 16, 2000, Mackinder left Schawk. (Def.'s 56.1 Statement ¶ 23.) On that same day,

6

Mackinder filed this diversity action, pursuant to 28 U.S.C. § 1332, in the Southern District of New York, alleging breaches of contract, tort claims, and a claim seeking declaratory relief for an issuance of an unrestricted stock certificate. Parties also agree that sometime in early August 2000, the Escrow Agent, Goldstein, released the entire $350,000.00 in escrow funds to Mackinder. (Def.'s Mem. of Law at 7; Goldstein Dep. at 164-65.) On November 22, 2000, Defendant filed an answer asserting affirmative defenses and counterclaims of breach of contract and misrepresentation. In response to the counterclaims, Plaintiff filed a motion for sanctions pursuant to Federal Rule of Civil Procedure 11 against Defendant and defense counsel.

On August 20, 2001, Mackinder requested Schawk to remove the restrictive legend on her stock certificate. By a letter dated October 17, 2001, Schawk refused the request unless Mackinder agreed to hold the proceeds from any sale of the stock in escrow pending the outcome of the litigation. (Pl.'s 56.1 Stmt. ¶¶ 26-27; Def.'s Resp. to Pl.'s 56.1 Stmt. ¶¶ 26-27.)

Plaintiff filed an Amended Complaint ("Amended Complaint") on February 5, 2002.

Plaintiff moved for summary judgment on Defendant's counter-claims on August 23, 2002; Defendant moved for summary judgment on Plaintiff's claims also on that day.

**A.  Summary Judgment Standard**

A district court should grant summary judgment when there is no "genuine issue as to any material fact," and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c); <u>see also</u> <u>Hermes Int'l v. Lederer de Paris Fifth Ave., Inc.</u>, 219 F.3d 104, 107 (2d Cir. 2000).  Genuine issues of fact cannot be created by mere conclusory allegations; summary judgment is appropriate only when, "after drawing all reasonable inferences in favor of a non-movant, no reasonable trier of fact could find in favor of that party."  <u>Heublein v. United States</u>, 996 F.2d 1455, 1461 (2d Cir. 1993) (citing <u>Matsushita Elec. Industr. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 587-88, 106 S. Ct. 1348, 89 L.Ed.2d 538 (1986)).

In assessing when summary judgment should be granted, "there must be more than a 'scintilla of evidence' in the non-movant's favor; there must be evidence upon which a fact-finder could reasonably find for the non-movant."  <u>Id.</u> (citing <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 252, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)).  A court must always "resolv[e] ambiguities and draw [] reasonable inferences against the moving party," <u>Knight v. U.S. Fire Ins. Co.</u>, 804 F.2d 9, 11 (2d Cir. 1986);

however, the non-movant may not rely upon "mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment."  Id. at 12.  Instead, when the moving party has documented particular facts in the record, "the opposing party must, 'set forth specific facts showing that there is a genuine issue for trial.'"  Williams v. Smith, 781 F.2d 319, 323 (2d Cir. 1986) (quoting Fed. R. Civ. P. 56(e)).  Establishing such facts requires going beyond the allegations of the pleadings, as the moment has arrived "to put up or shut up." Weinstock v. Columbia University, 224 F.3d 33, 41 (2d Cir. 2000) (internal quotations and citation omitted).  Unsupported allegations in the pleadings thus cannot create a material issue of fact.  Id.

Finally, for cases in which both sides move for summary judgment, a district court need not grant judgment as a matter of law for one side or the other.  See Schwabenbauer v. Bd. of Educ. of Olean, 667 F.2d 305, 313 (2d Cir. 1981).  Instead, it must evaluate "each party's motion on its own merits, taking care in each instance to draw all reasonable inferences against the party whose motion is under consideration."  Id. at 314.

When the summary judgment motion concerns a question of a contract's proper construction, "summary judgment may be granted when its words convey a definite and precise meaning absent any

ambiguity."  Seiden Assoc.'s, Inc. v. ANC Holdings, Inc., 959

F.2d 425, 428 (2d Cir. 1992).  On the other hand, "[w]here the

language used is susceptible to differing interpretations, each

of which may be said to be as reasonable as another . . . the

meaning of the words become an issue of fact and summary judgment

is inappropriate."  Id. (citations omitted).

Even where parties dispute the meaning of specific contract

clauses, a court must determine whether such clauses are

ambiguous when "read in the context of the entire agreement."

Sayers v. Rochester Tel. Corp., 7 F.3d 1091, 1095 (citing W.W.W.

Assocs. Inc. v. Giancontieri, 77 N.Y.2d 157, 163 (1990)).


B.  Contract Claims

Plaintiff has moved for summary judgment on the Defendant's

counterclaims charging Plaintiff with breach of the Employment

and Merger Agreements.  Defendant Schawk has moved for summary

judgment on Plaintiff's claims that Defendant breached its

obligations pursuant to the Employment Agreement.

The parties have both cited New York law in support of their

arguments.  Such "implied consent . . . is sufficient to

constitute choice of law."  Motorola Credit Corp. v. Uzan, 388

F.3d 39, 61 (2d Cir. 2004) (citing Krumme v. Westpoint Stevens,

Inc., 238 F.3d 133, 138 (2d Cir. 2000)).  Thus, New York law

governs the disputes between the Parties.

### 1. Merger Agreement

Defendant has asserted a counterclaim for breach of the
Merger Agreement. Defendant contends that a purchase price
adjustment was required pursuant to Section 2.2 of the Merger
Agreement when MGI failed to achieve the sales amount of
$2,500,000.00 during the prescribed period; hence, the release of
the $350,000.00 withheld in the Escrow Account violated the
Merger Agreement. Plaintiff argues that summary judgment should
be granted dismissing Defendant's counterclaim because the
Defendant failed to satisfy conditions precedent contained in the
contract.

The New York Court of Appeals has summarized the law of
conditions precedent as follows:

> A condition precedent is an act or event, other than a
> lapse of time, which, unless the condition is excused,
> must occur before a duty to perform a promise in the
> agreement arises . . . Conditions can be express or
> implied. Express conditions are those agreed to and
> imposed by the parties themselves. Implied or con-
> structive conditions are those imposed by law to do
> justice. Express conditions must be literally performed,
> whereas constructive conditions, which ordinarily arise
> from language of promise, are subject to the precept
> that substantial compliance is sufficient . . . In
> determining whether a particular agreement makes an
> event a condition courts will interpret doubtful lan-
> guage as embodying a promise or constructive condition
> rather than an express condition. This interpretive
> preference is especially strong when a finding of

11

> express condition would increase the risk of forfei-
> ture by the obligee.

Oppenheimer & Co. v. Oppenheim, 86 N.Y.2d 685, 690-91 (1995). In New York, "conditions are not favored ... and in the absence of unambiguous language, a condition will not be read into the contract." Ginnett v. Computer Task Group, Inc., 962 F.2d 1085, 1099-1100 (2d Cir. 1992); see also Kidder Peabody & Co., Inc. v. Unigestion Intern., Ltd., 903 F.Supp. 479, 501 (S.D.N.Y. 1995) (holding that "a contractual duty is not to be construed as a condition precedent unless the language of the contract clearly imposes such a condition.").

In making an event a condition, "Parties often use language such as 'if,' 'on condition that,' 'provided that,' 'in the event that,' and 'subject to' . . . but other words may suffice." 2 Farnsworth, *On Contracts* § 8.2 (3d ed. 2004). Although "there is no requirement that such phrases be utilized, their absence is probative of the parties' intention that a promise be made rather than a condition imposed . . . ." 13 Williston, *On Contracts* § 38:16 (4th ed. 2000).

If the contract expressly makes some requirements condition precedents, such a fact will be taken into consideration in determining whether other provisions that are not obviously express conditions, are promises or conditions precedent. See Int'l Fid. Ins. Co. v. Rockland, 98 F.Supp. 2d 400, 412 (S.D.N.Y.

2000) ("Sophisticated lawyers, such as those drafting standard forms . . . must be presumed to know how to use parallel construction and identical wording to impart identical meaning when they intend to do so, and how to use different words and construction to establish distinctions in meaning."); <u>see also</u> <u>Seetransport Wiking Trader Schiffarhtsgesellschaft MBH & Co. Kommanditgesellschaft v. Republic of Romania</u>, 123 F.Supp. 2d 174, 188, fn. 16 (S.D.N.Y. 2000) (court declined to find a condition precedent in settlement contract, stating that if sophisticated parties intended a condition precedent, they could have explicitly so provided.).

Defendant claims that Plaintiff breached the Merger Agreement by withdrawing the whole sum contained in the Escrow Account and failing to repay sums due to Defendant pursuant to the Merger Agreement when MGI did not achieve sales of $2,500,000.00 during the relevant period. (Def.'s Answer and Counterclaims ¶ 28.) Plaintiff argues that summary judgment should be granted dismissing this claim because Defendant, by not performing contractual condition precedents, has no right to invoke Sections 2.2 or 3.7 of the Merger Agreement (concerning repayment of sums due to Defendant). The condition precedents, Plaintiff claims, are contained in the procedures laid out in Section 2.2 of the Merger Agreement, which include providing

statements for MGI's sales according to Generally Accepted

Accounting Principles ("GAAP"), maintaining appropriate books,

and delivering the income statements to MGI, the escrow agent and

Mackinder.  (Pl.'s Mem. of Law at 13; Def's Answer and

Counterclaims at Ex. A.)     Defendant, however, characterizes

the contractual language as a promise, and not a condition.

(Def.'s Resp. at 8.)

The contested provision in the Merger Agreement reads in

part as follows:

> Any such reduction in Merger Consideration shall be
> calculated on the basis of income statements for MGI,
> prepared by Schawk, on a basis consistent with the
> manner in which the Annual Financial Statements have
> been prepared (to the extent such manner is in accor-
> dance with GAAP) and in accordance with GAAP . . . .
> Schawk agrees to maintain until at least December 31,
> 1999, books and records for MGI on a stand-alone basis
> so that such annual sales amount can be computed.  On
> or prior to February 15, 2000, Schawk shall deliver to
> Stockholders an income statement for MGI division or
> Subsidiary of Schawk for each of twelve-month periods
> commencing on or after October 1, 1998 and ending on
> or before December 31, 1999.

(Pl.'s Mem. of Law at Ex. A, § 2.2.)

As a preliminary matter, it is clear that the contested

contractual provision does not contain any of the usual

identifying language that forms an express condition, such as

"if" or "on condition that."  Also, as demonstrated in Section 8

of the Merger Agreement, the parties knew how to construct

express conditions and, indeed, included many such conditions in

the Agreement.

The contested language, instead, appears to be a promise with which Defendant has substantially complied.  Defendant acknowledges that it failed to comply with the procedures set out in Section 2.2 of the Merger Agreement, and that it failed to provide the information by February 15, 2000.  (Def.'s Resp. at 7.)

However, Defendant states that it "put Plaintiff on notice both orally and in writing that MGI's sales fell below the $2.5 million for the relevant period."  (Id. at 6.)  Furthermore, according to Defendant, "Plaintiff was intimately involved in developing the sales figures used."  (Id. at 5.)  Defendant claims that Plaintiff produced the figures used by Defendant's accountant, Serge Pepin, in determining MGI's sales.  Plaintiff, Defendant states, has not contested the accuracy of figures she brought to Defendant's attention.

In support of this contention, Defendant cites testimony by Goldstein.  Defendant questioned Goldstein about a letter sent to Goldstein by Mr. Vittorini concerning the sales shortfall.  In response to the question, "And you personally never contested those figures as being incorrect figures," Goldstein responded, "I had no reason to."  (Goldstein Dep. at 128-29.)  Testimony by Mackinder and Pepin does not dispute the source of the figures

used as being jointly developed by Mackinder and Serge Pepin. (Mackinder Dep at 210, 250-55; Pepin Dep. at 47-49.)

Moreover, although Defendant did not supply the required sales information to Plaintiff by February 15, 2000, it did so by March 2000, "within three weeks of . . . the date provided in the Agreement [February 15, 2000]." (Def.'s Resp. at 7.)

It appears to the Court that the purpose of the extensive procedure laid out in Section 2.2 of the Merger Agreement, including compliance with GAAP, and the February 15, 2000 deadline, was to ensure the numerical accuracy of Plaintiff's sales and provide Plaintiff opportunity to contest the figures. Although the testimony of Mackinder, cited by Defendant, (Mackinder Dep. at 208-10), does not clearly state whether she agreed with the final sales amount contained in the letter from Mr. Vittorini, it appears from her testimony that she knew it was less than $2,500,000.00. (Mackinder Dep. at 189.) Given this testimony, and Defendant's supported claims that Plaintiff was on notice of the shortfall, as well as the fact that the information was provided only 3 weeks after the contracted deadline requires denial of Plaintiff's Motion for Summary Judgment on Defendant's counterclaim of breach of the Merger Agreement.[1]

---

[1] Furthermore, as Defendant notes, finding a condition precedent in this case, and granting summary judgment to Plaintiff, would result in the forfeiture of the amount held in

Accordingly, Plaintiff's Motion for Summary Judgment of Defendant's counterclaim of breach of the Merger Agreement is DENIED.

### 2. Employment Agreement

Defendant argues that summary judgment should be granted dismissing Plaintiff's First, Second and Third Causes of Action based on the Defendant's alleged breach of the Employment Agreement. Plaintiff claims that Defendant failed to honor the terms of the Agreement and that this failure led Plaintiff to be paid less than her full salary rate. Plaintiff further claims that pursuant to Paragraph 2(b) of the Employment Agreement, Defendant wrongfully reduced her salary as of January 1, 2000, when the earliest it could have reduced her compensation was April 1, 2000.

Instead Defendant contends, and has asserted a counterclaim, that Mackinder herself clearly breached Section 8(a) of the Employment Agreement by leaving her job in August 2000 without prior notice or any effort to resolve differences that may have arisen. (Def.'s Answer and Counterclaims ¶¶ 29-36.) Plaintiff in turn argues for summary judgment dismissing that counterclaim.

---

the Escrow Account, if, in fact, it is determined that Defendant was entitled to the amount contained in the Escrow Account. (Def.'s Resp. at 11-12.)

### a. Paragraph 2(b) of the Employment Agreement

Paragraph 2(b) sets forth the procedure for reducing Plaintiff Mackinder's salary in the event MGI's annual sales "measured quarterly commencing December 31, 1999 on a trailing twelve month basis fall below $1,800,000."  (Am. Compl. at Ex. A, ¶ 2.)

Defendant moves for summary judgment on Plaintiff's claim of breach of the Employment Agreement by Defendant's reduction of Plaintiff's salary starting in January 1, 2000.  Defendant claims that the language quoted in the previous paragraph is clear and that the "plain meaning of the Agreement . . . provides that the date for measuring the sales commences with sales achieved as of December 31, 1999."  (Def.'s Mem. of Law at 16.)  Plaintiff contends, however, that this language is ambiguous.  Plaintiff interprets the provision as stating that the trailing twelve month period began on April 1, 2000, at the end of the first quarter of 2000 – "<u>commencing</u> on December 31, 1999 and ending on March 31, 2000."  (Pl.'s Resp. at 21.)

The language "measured quarterly commencing December 31, 1999 on a trailing twelve month basis" appears to contain ambiguities, as Plaintiff states in its response to Defendant's summary judgment motion.  It is not clear from the contractual language whether the twelve-month period began on December 31,

1999, or whether, as Plaintiff claims, the twelve month period
began at the end of the first quarter commencing on December 31,
1999.

Accordingly, summary judgment dismissing Plaintiff's Third
Cause of Action is DENIED.


           b.   Material Breach of the Employment Agreement
     The determination of which party should be granted summary
judgment on remaining claims and counterclaims based on breach of
the Employment Agreement rests on whether the conduct attributed
to Defendant by Plaintiff constitutes a material breach of the
Employment Agreement.

     In New York, a breach is material if it "go[es] to the root
of the agreement between the parties," and "is so substantial
that it defeats the object of the parties in making the
contract."  Felix Frank Assocs., Ltd. v. Austin Drugs, Inc., 111
F.3d 284, 289 (2d Cir. 1997) (citing Septembertide Pub., B.V. v.
Stein and Day, Inc., 884 F.2d 675, 678 (2d Cir. 1989)).  The
Court may consider a number of factors in determining whether a
party's breach defeats the object of the agreement, including the
"special purpose of the contract," id., as well as "the extent to
which the injured party will be deprived of the benefit which
[it] reasonably expected"; "the extent to which the injured party

19

can be adequately compensated for the part of that benefit of which he will be deprived"; "the extent to which the party failing to perform or to offer to perform will cure his failure, taking account of all the circumstances including any reasonable assurances"; and "the extent to which the behavior of the party failing to perform or to offer to perform comports with standards of good faith and fair dealing." <u>See</u> Rest. (Second) of Contracts, § 241(a). The material breach of one party relieves, or excuses, the other party from further performance obligations. <u>Felix Frank</u>, 111 F.3d at 289. Commentators have stated that the materiality of a breach is ordinarily a question of fact. <u>See</u> <u>Calamari & Perillo</u>, *The Law of Contracts,* § 11-18(a) (3d ed. 1987); <u>see also</u> Williston, *On Contracts*, § 63:3, 440-41, n. 34 (4th 3d. 2002).

Plaintiff alleges numerous material breaches of the Employment Agreement by Schawk as a basis for her First, Second and Third Causes of Action.

Specifically, Mackinder claims that Schawk required Mackinder to report to Steven King of Chromart, rather than the Vice President or President of Schawk as agreed to in the Employment Agreement. Mackinder states that David Schawk, the President of Schawk, "treated [her] with complete disregard," and excluded her from meetings and discussions that included general

managers of other divisions of Schawk. (Pl.'s Resp. at 6.). Her authority as President of MGI was undermined, preventing her from directing and controlling MGI's quality control and obtaining other benefits of her Agreement. (Am. Compl. ¶¶ 53-59). Plaintiff further contends that David Schawk did not instruct anyone at Chromart that Mackinder was to have a final say on quality issues relating to her work, (Pl.'s Resp. at 7); in fact, all business decisions were left to King (Id. at 7.)

Mackinder states that King, in "undertaking his 'delegated duties, . . . acted in direct contravention of the Employment Agreement." (Pl.'s Resp. at 8.) King removed the one skilled employee at Chromart, Joe Terrone ("Terrone"), who had worked with Mackinder prior to the merger, leaving Mackinder to do all the time-consuming work herself. (Id.; Mackinder Dep. at 75.) Chromart employees refused to take Mackinder's instruction, leading her to have to take "unacceptable work to client reviews." (Mackinder Dep. at 93-94, 124-25.) According to Plaintiff, MGI's relatively low sales were a result of numerous other difficulties in Mackinder's working relationship with King and other Chromart employees. (Pl.'s Resp. at 13.) Though she made numerous complaints to Schawk employees, nothing was done by Schawk to mediate or rectify the situation. (Id.) This led to Mackinder leaving Schawk on August 16, 2000.

Defendant, however, sharply disagrees with Plaintiff. In its reply, Defendant states: "John Grisham would be proud of Plaintiff's Memorandum of Law in Opposition to Schawk's Motion for Summary Judgment - it is pure legal fiction . . . Plaintiff's catalogue of normal workplace differences of opinion, artistic tension and perceived slights do not even come close to a claim for material breach of contract that this Court could send to the jury." (Def.'s Reply at 1.)

Defendant denies that Plaintiff reported to Steven King. (Schawk Dep. at 23-24; King Dep. at 113.). Defendant quotes David Schawk's deposition testimony as follows:

> Q:  (By Ms. Wagner) Isn't it true that you told Steve King that he was to manage Elizabeth Mackinder -
>
> A:  No.
>
> Q:  - that Elizabeth Mackinder was supposed to report to Steve King.
>
> A:  No.  That's not true at all.

(Schawk Dep. 57-58.)  Defendant also denies that it did not provide the required administrative support to Mackinder and states that the continuing placement of Mr. Terrone in Mackinder's project was not part of the contract.  (Def.'s Reply at 4.)  According to Schawk and King, Chromart provided support to Mackinder and completed all the projects successfully.  (Id. at 6.)  Furthermore, Defendant contends that Plaintiff's

complaint that she did not have direct control over quality is unfounded. Defendant acknowledges that she did not have control over Chromart artists, but notes that the Employment Agreement does not provide for such control. (Id. at 7.)

In sum, Defendant characterizes Plaintiff's complaints as "evidence of workplace friction, differences of opinion over artistic judgments and Mackinder's purported inability to control Chromart's artists . . . ," evidence that "does not amount to a material breach of the contract." (Id.)

Plaintiff and Defendant paint starkly different pictures of what took place after the merger, which are not resolved by the Parties' submissions. Whether the conduct of Defendant constitutes a material breach of the Employment Agreement is a genuine issue of material fact. If the agreement was materially breached by Defendant, Plaintiff cannot then be accused of breaching the same agreement by terminating her employment with Schawk. Accordingly, summary judgment is DENIED to both Plaintiff and Defendant on all claims and counterclaims pertaining to the Employment Agreement.

C.   Fraud Claims

Defendant moves for summary judgment on Plaintiff's claim of fraud. Specifically, Plaintiff alleges that Defendant never

intended to honor the promises made to Mackinder in the Employment Agreement, (Am. Compl. ¶ 79), and that Defendant misrepresented to Plaintiff during the negotiation of the Employment Agreement that it would honor the terms of the contract, when it never intended to do so.  (Id. ¶¶ 74-86.)

Plaintiff also moves for summary judgment on Defendant's counterclaim of fraud.  Defendant claims Plaintiff's representations to Schawk's personnel that sales were likely to be at least $2,500,000.00 by September 30, 1999, and that she would remain an employee of Schawk for at least three years after MGI was acquired by Schawk, were fraudulent.

Under New York law, a plaintiff alleging fraudulent misrepresentation must demonstrate:  "(1) that the defendant made a misrepresentation; (2) as to a material fact; (3) which was false; (4) and known to be false by the defendant; (5) that the misrepresentation was made with the purpose of inducing the plaintiff to rely on it; (6) that the plaintiff rightfully did so rely; (7) in ignorance of its falsity; (8) to his injury."  Inter Impex S.A.E. v. Comtrade Corp., No. 00 Civ. 0133, 2004 WL 2793213, at *7 (S.D.N.Y. Dec 6, 2004) (citing Cohen v. Koenig, 25 F.3d 1168, 1172 (2d Cir. 1994)).

"It is clear that a fraud claim is not established by simple allegations that the defendant failed to meet its contractual

obligations." <u>Dornberger v. Metropolitan Life Insurance Co.</u>, 961 F.Supp. 506, 540 (S.D.N.Y. 1997) (citing <u>Stewart v. Jackson & Nash</u>, 976 JF.2d 86, 89 (2d Cir. 1992)). However, the New York Court of Appeals has held that a contracting party can be held liable for fraud when at the time he made a promise, he did not intend to keep it. <u>See</u> <u>Channel Master Corp. v. Aluminium Ltd. Sales, Inc.</u>, 4 N.Y.2d 403 (1958); <u>see also</u> <u>Deerfield Communications Corp. v. Chesebrough-Ponds, Inc.</u>, 68 N.Y.2d 954 (1986) (stating that a promise made with the preconceived notion of not performing it constitutes a misrepresentation). The Court of Appeals set out its rationale in <u>Sabo v. Delman</u>, 3 N.Y.2d 155 (1957), where the Court quoted a previous Court of Appeals case as follows:

> We think the allegations in the complaint describe a case where a defendant has fraudulently and positively as with personal knowledge stated that something was to be done and that his representations were false. It is not a case of prophecy and prediction of something which it is merely hoped or expected will occur in the future, but a specific affirmation of an arrangement under which something is to occur, when the party making the affirmation knows perfectly well that no such thing is to occur. Such statements and represen- tations when false are actionable [as fraud]

3 N.Y.2d at 160 (quoting <u>Ritzwoller v. Lurie</u>, 225 N.Y. 464 (1919)).

Many New York courts have carved an exception to this rule and have held that "where a fraud claim arises out of the same

facts as plaintiff's breach of contract claim, with the addition
only of an allegation that defendant never intended to perform
the precise promises spelled out in the contract between the
parties, the fraud claim is redundant and plaintiff's sole remedy
is for breach of contract.  <u>See e.g.</u>, <u>PI, Inc. v. Quality Prods.,
Inc.</u>, 907 F.Supp. 751, 761 (S.D.N.Y. 1995) (citing numerous
Appellate Division cases where courts held that a cause of action
for fraud cannot exist when the fraud claim arises out of the
same facts as a breach of contract claim with the sole additional
allegation that the defendant never intended to fulfill its
express contractual obligations); <u>Sudul v. Computer Outsourcing
Servs.</u>, 868 F.Supp. 59, 62 (S.D.N.Y. 1994) (citations omitted);
<u>see also</u> <u>Best Western Int'l v. CSI Int'l Corp.</u>, No. 04 Civ. 0360,
1994 WL 465905 at *4 (S.D.N.Y. Aug. 23, 1994) (stating that the
majority of courts, including the Appellate Division, have held
that "simply dressing up a breach of contract claim by further
alleging that the promisor had no intention, at the time of the
contract's making, to perform its obligations thereunder, is
insufficient to state an independent tort claim").  As the court
in <u>Sudul</u> concluded, "A plaintiff . . . should not be allowed to
bootstrap a breach of contract claim into a fraud claim by simply
including in his complaint an allegation that defendant never
intended to hold up his end of the deal."  868 F.Supp. at 62.

In this case, Plaintiff alleges that "As part of Schawk's tortious scheme to misappropriate Mackinder's goodwill, the material and willful breaches of the Agreement described above were intended and calculated to make conditions for Mackinder in her employment so intolerable and difficult that Mackinder would abandon MGI and its goodwill to Schawk." (Am. Compl. ¶ 81.) Defendant argues that Plaintiff's fraud claim is insufficient in law and fact because the fraud allegations are "neither collateral nor extraneous to the terms of the parties' agreement." (Def.'s Reply at 9.)

Despite the addition of language such as "misappropriation" and "goodwill" in her Complaint, Plaintiff's claim essentially is that Defendant's intent at the time it entered into the contract, was never to hold up its end of the deal. Indeed, in the Amended Complaint, Plaintiff claims "Schawk never intended to honor the promises made to Mackinder in the Agreement." (Am. Compl. ¶ 79.) Plaintiff is "bootstrapping" a breach of contract claim into a fraud claim, which she cannot do. Plaintiff's fraud claim is virtually indistinguishable from her contract claim concerning the same contract provision. She is not alleging any facts that would lead to an "inference" that Schawk never intended to carry out its promises. Moreover, the issue at hand, the Employment Agreement, is central to the contract and subsequent dispute.

Clearly, this case falls out of the rule established by the New York Court of Appeals and cannot be maintained as a misrepresentation claim.

The language contained in Defendant's counterclaim alleging fraud, with the addition of allegations that Plaintiff made false representations to Defendant concerning the Employment and Merger Agreements, is virtually identical to its Fourth and Fifth Causes of Action, claiming breach of the Employment and Merger Agreements. Defendant's counterclaim suffers from the same deficiency as Plaintiff's fraudulent claim.

Accordingly, summary judgment is GRANTED to Defendant on Plaintiff's fraudulent misrepresentation claim. Summary judgment is also GRANTED to Plaintiff on Defendant's fraudulent misrepresentation counterclaim.


D.  Misrepresentation Claims

In addition to the fraudulent misrepresentation counter-claim, Defendant also charges Plaintiff with negligent and innocent misrepresentation. Plaintiff has moved for summary judgment to dismiss these counterclaims.

Defendant's counterclaims of negligent and innocent misrepresentation concern the obtainable sale amount allegedly stated by Plaintiff by September 30, 1999, and her

representations concerning her continued employment with Schawk for three years after the Merger.  Defendant requests rescission and other appropriate damages.  (Def.'s Answer and Counterclaims at 13-14.)

It is well-settled in New York law that negligent misrepresentation requires the following elements:  "(1) careless in imparting words; (2) upon which others were expected to rely; (3) and upon which they did act or failed to act; (4) to their damage; . . . and (5) the declarant must express the words directly, with knowledge or notice that they will be acted upon, to one to whom the declarant is bound by some relation or duty of care."  <u>Dallas Aero, Inc. v. CIS Air Corp.</u>, 352 F.3d 775, 788 (citing <u>White v. Guarante</u>, 43 N.Y.2d 356 (1977)).  A claim for negligent misrepresentation has been found to be precluded "in a breach of contract action absent a violation of a legal duty 'independent of that created by the contract.'"  <u>Fleet Bank v. Pine Knoll Corp.</u>, 290 A.D.2d 792 (3rd Dept. 2002).

Innocent misrepresentation, however, does not require scienter.  The representation need only be "material" and "justifiably relied upon."  <u>W. Side Fed. Savings & Loan Ass'n of N.Y. City v. Hirschfeld</u>, 476 N.Y.S.2d 292, 294 (1st Dept. 1984).  As the New York Supreme Court explained, "If we subtract from fraud the element of *scienter,* the remainder constitutes the tort

of innocent misrepresentation."  476 N.Y.S.2d at 29 (emphasis in original).  See also Stern v. Satra Corp., 539 F.2d 1305, 1308 (2d Cir. 1976) ("New York law . . . is well settled that an innocent misrepresentation of a material fact permits rescission even though made without an intent to deceive.").

     Plaintiff argues that the two misrepresentation claims should be dismissed because Defendant could never prove that it relied on any misrepresentation of fact concerning MGI's prospective sales yield.  According to Plaintiff, Defendant conducted due diligence and knew the financial status and potential of MGI.  Plaintiff stated in her deposition that at the time of due diligence, she responded to a question by Defendant about her sales, "And I said, you have just looked at my books and you see my sales as they are.  Is it feasible since I am close to 2 million for me to achieve a 1/2 million dollars more. It's possible but I cannot promise."  (Mackinder Dep. at 188.)

     With the knowledge that the $2,500,000.00 sales mark might not be achieved, Defendant added terms to the Merger Agreement, namely Section 2.2, 8.2.13 and 12.4, as a contingency plan in the event MGI did not reach the $2,500,000.00 mark in sales, as well as a salary-reducing provision in Plaintiff's Employment Agreement.  Plaintiff further supports its position by including e-mails from Schawk personnel prior to the finalization of the

merger which indicates that Schawk knew that the $2,500,000.00 in sales could very well not be reached by the end of the stated period.  (Brickell Aff. at Ex. C.; Mead Dep. at 151-52.)

Defendant Schawk disputes that due diligence can be raised as a defense,[2] and states that it did not have full access to all relevant information in order to completely conduct proper due diligence.  Defendant states that after Plaintiff informed it that sales might not reach $2,500,000.00, it sought reassurance from Ira Goldstein, MGI's "chief negotiator," who once again assured Defendant that the $2,500,000.00 would be reached. Section 2.2 of the Merger Agreement, Defendant contends, was included only as an incentive so that Plaintiff would reach the sales goal quicker.

Defendant has represented to the Court that it relied upon Mr. Goldstein's reassurance after speaking with Plaintiff Mackinder.  However, the Court's review of the documents submitted in support of Plaintiff's summary judgment motion reveals a statement by Chris Mead to the contrary.  In an email

---

[2] The cases relied upon by Defendant, PKFinans Int'l Corp. v. IBJ Schroeder Leasing Corp., No. 96 Civ. 1816, 1996 WL 363138 (S.D.N.Y. June 28, 1996) and Rubinberg v. Hydronic Fabrications, Inc., 775 F.Supp. 56 (E.D.N.Y. 1991), in support of its argument that due diligence cannot be raised as a defense, appear to make this reasoning in the context of allegations of fraudulent representation.

dated Friday, July 2, 1999, Chris Mead, Vice President of Schawk,
writes to various Schawk personnel:

> We reviewed the assumptions we were working with that
> were obtained earlier from Ira and upon which we came
> to accept a valuation of $2.0 million.  Ira was soft
> spoken (with less of his stronger tone and less argu-
> mentative) and as much recognized that the information
> he provided earlier could now be different.

(Brickell Aff. at Ex. C.)  David Schawk, president of Schawk,
stated that he had discussions with Chris Mead concerning the
likelihood that the $2,500,000.00 in sales would not be achieved
and in response to the question "In fact, based on these
discussions, isn't it true that you renegotiated the acquisition
price," stated "I believe this is part of it, yes."  (Schawk Dep.
at 99-101.)  The mechanisms in place in both the Merger and
Employment Agreements in the event that MGI did not achieve
$2,500,000.00 in sales belie reliance on the $2,500,000.00 sales
projection.

Defendant also contends that the contract should be
rescinded because Mackinder misrepresented to Defendant that she
would remain as an employee of Schawk for at least three and
faithfully perform her duties and responsibilities under the
Employment Agreement.  Plaintiff counters that there is no
evidence Mackinder did not intend to honor the terms of the
Employment Agreement.

The Court agrees with Plaintiff.  No evidence has been submitted by Defendant to show that Plaintiff made any kind of misrepresentations to Defendant concerning her future employment with Schawk.  In her deposition, Mackinder was asked why she was interested in a merger with Schawk.  She replies:

> Because I thought it would be advantageous for me.  I felt that I was sort of a small boutique company and that it would be advantageous for me to utilize the other Schawk companies to bring in new business and diverse business and more Revlon business.  Being a part of the Schawk team.  I stated an interest in that.

(Pl. Exhibit J, p.181.)  According to Plaintiff, she left Schawk because the work environment became such that she could no longer achieve sales and because Defendant Schawk was not meeting its contractual duties.  King affirmed that "it was [Mackinder's] desire to diversify her client base" when she formed Schawk.  This goal, according to King, was communicated to him by Schawk.  (King Dep. at 100.)  There is nothing to suggest that Mackinder did not intend to finish out her contract.

Accordingly, Plaintiff's Motion for Summary Judgment on the negligent and innocent misrepresentation causes of action is GRANTED.


E.  Prima Facie Tort

Defendant moves for summary judgment on Plaintiff's prima

33

facie tort claim in which she argues that Defendant's breach of the Agreement was intended to "cause harm to Mackinder, her business and her reputation as an artist."  (Compl. ¶ 88.)

The elements of a prima facie tort claim are:  (1) intentional infliction of harm; (2) resulting in special damages; (3) without excuse or justification; (4) by an act that would otherwise be lawful.  See Twin Laboratories, Inc. v. Weider Health and Fitness, 900 F.2d 566, 571 (2d Cir. 1990) (citing Burns Jackson Miller Summit & Spitzer v. Lindner, 59 N.Y.2d 314, 332 (1983)).  A prima facie tort "requires that the acts complained of would otherwise be lawful but for disinterested malevance."  Chen v. United States, 854 F.2d 622 (2d Cir. 1988) (internal citations and quotations omitted),  "[D]isinterested malovence" means that the plaintiff cannot recover unless the defendant's conduct was not only harmful, but done with the sole intent to harm."  Twin Laboratories, Inc., 900 F.2d at 571. Other motives, including profit, self-interest, or business, are not sufficient under the doctrine of prima facie tort.  Id. (citations omitted); see also Marcella v. ARP Films, Inc., 778 F.2d 112 (2d Cir. 1985).

The alleged actions of Defendant against Plaintiff do not rise above these other motives.  There is no evidence in the record to support any claim of malevolence on the part of the

Defendant.  The Court finds the claim to be without merit and

Defendant is GRANTED summary judgment on this claim.


F.   Plaintiff's Claim for Unrestricted Stock

Plaintiff moves for summary judgment on her request to have

the restrictive legend removed from 81,703 shares of Class A

common stock she received as part of the Merger Agreement.

Plaintiff claims that as a matter of law, Schawk should be

required to issue clean stock certificates as the two-year time

limitation pursuant to Rule 144(k) of the Securities Act of 1933,

has expired.  Schawk's refusal to do so, she contends, is without

legal basis.  Defendant counters by asserting that the issuance

of stock was subject to the terms of the Merger Agreement, which

it alleges in its counterclaims, was breached by Plaintiff.

New York choice of law provisions dictate that Delaware law

governs the issue raised by Plaintiff.  According to New York

law, the rights and duties of the issuer with respect to the

registration of a transfer is governed by the local law of the

issuer's jurisdiction.  <u>See</u> N.Y. Uniform Commercial Code § 8-110

(McKinney 2001 Supp.).  Schawk, the issuer in this case, is

incorporated in Delaware and is therefore subject to Delaware

law.

Section 4(1) of the Securities Act of 1933 exempts from

35

registration those transactions conducted by someone other than an issuer, underwriter, dealer or affiliate.  <u>See</u> Section 4(1) of the 1933 Act.  Rule 144(k) of the Securities Act of 1933 provides that in the event that the person who purchased restricted securities "is not an affiliate of the issuer at the time of the sale and has not been an affiliate during the preceding three months," any restrictions on securities will expire after two years.  17 C.F.R. §230.144(k).

The Delaware Chancery Court has held that a neutral issuer has a duty to issue clean stock certificates and may not take a partisan position when faced with adverse claimants concerning the removal of stock restrictions.  <u>See</u> <u>Bender v. Memory Metals, Inc.</u>, 514 A.2d 1109, 1118 (Del. Ch. 1986).  However, in situations where the issuer is not a neutral party, the Delaware courts have allowed the issuer to deny a request to remove restrictive legends.  <u>See</u> <u>Pharm-Eco Laboratories, Inc. v. Immtech International, Inc.</u>, 2001 WL 220698, at *11 (court held that Defendant had a good-faith basis to deny Plaintiff's request for the lifting of the restrictions on the shares because consideration for the shares was yet to be delivered.).  The court in <u>Pharm-Eco</u> found that the Plaintiff had committed a material breach of the agreement, and stated the following:

[Plaintiff] was in no position to ask [Defendants]

to permit the Shares to be freely transferred to
third parties.  If [Defendants] granted the Transfer
Request and permitted a free transfer of certified
Shares *without* restrictive legends to third parties,
the Shares would not be recoverable from those third-
parties . . .  It was not unreasonable for [Defendants]
to demand that [Plaintiff] bring its own behavior
into compliance with the contract before acceding to
[Plaintiff's] Transfer Request.

Id. (footnotes omitted).[3]

The restrictive legend on the common stock issued to

Mackinder states in pertinent part:

The shares represented by this certificate may not be
transferred in violation of such act and laws, the
rules and regulations thereunder or the provisions
of said stock purchase agreement . . .  The holder of
this certificate, by the acceptance of this certificate,
agrees to be bound by the provisions of such stock
purchase agreement.

(Brickell Aff. at Ex. F.)

It is clear that the issuer in this case, Schawk, is not a

neutral party to this litigation.  It is also clear from the

language contained in the restrictive legend that the shares were

subject to the Merger Agreement and the Employment Agreement.

Defendant Schawk contends that Plaintiff breached these

_____

[3] The court in Pharm-Eco also cited an SEC No-Action Letter
where, in the context of the performance by consultants under a
consulting contract, the SEC stated that the completion of the
last act required of the consultants triggered the commencement
of the holding period of restricted securities issued to the
consultant in exchange for its services.  Id. (citing Haldron,
Inc., SEC No-Action Letter, 1984 WL 45133, at *2 (April 23,
1984)).

agreements and is thus, not entitled to the lifting of the
restrictive legends on the certificates issued to her at the time
of the Merger.  As stated previously, the issue of whether
Plaintiff breached the Employment Agreement remains unresolved at
this stage.  Since the removal of the restrictive legend turns on
this issue, Plaintiff's motion for summary judgment, to remove
the restriction on the stock certificates, is DENIED as premature
for determination at this time.

G.   Rule 11 Sanctions

     Plaintiff Mackinder has further requested this Court to
impose sanctions upon Defendant under Rule 11 of the Federal
Rules of Civil Procedure.  The Court has reviewed the request and
finds them to be without merit.  Although the Court has granted
summary judgment dismissing three of Defendant's counter-claims,
the Court has also granted Defendant summary judgment dismissing
two of Plaintiff's claims.  The counterclaims are not obviously
frivolous.  Accordingly, Plaintiff motion for Rule 11 sanctions
is DENIED.

### III.   CONCLUSION

     For the foregoing reasons, Defendant's summary judgment
motion is GRANTED on Plaintiff's causes of action alleging

fraudulent misrepresentation and prima facie tort. Plaintiff's summary judgment motion is GRANTED on Defendant's First, Second and Third Causes of Action alleging fraudulent, negligent and innocent misrepresentation.

Having determined the Parties' respective Motions for Summary Judgment, the Court observes that the following claims remain:

1.    Plaintiff's First, Second, Third and Sixth Causes of Action and

2.    Defendant's Fourth and Fifth Causes of Action.

On these causes of action, the Court sets the following pretrial submission dates:

• Joint Pre-Trial Statement ("JPTS"), Requests to Charge and Proposed Voir Dire are to be filed no later than October 31, 2005;

• Memoranda of Law addressing those issues in the JPTS are also to be filed no later than October 31, 2005;

• Responses to the Memoranda of Law are to be filed no later than November 14, 2005;

All submissions shall be in accordance with the Individual

Practices of Judge Deborah A. Batts, as amended May 5, 2005.  <u>See</u>

Individual Practices, available at

http://www.nysd.uscourts.gov/Individual_Practices/Batts.pdf.

SO ORDERED.

Dated:    New York, New York
          August 2 , 2005

                                    _Deborah A. Batts_
                                    DEBORAH A. BATTS
                              United States District Judge